**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ABBOTT LABORATORIES &,** | ) | |
| **SURMODICS, INC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 07 C 3428** |
| | ) | |
| **CHURCH & DWIGHT CO., INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Abbott Laboratories and Surmodics, Inc. (collectively Abbott) have sued Church & Dwight Co. (C&D) for infringement of two patents: U.S. Patent No. 5,654,162 ('162 patent) and U.S. Patent No. 6,020,147 ('147 patent). This case is before the Court for construction of disputed claim terms in the patents-in-suit. The parties submitted written briefs, and the Court held a claim construction hearing on December 12, 2008.

**Background**

The patents-in-suit, along with U.S. Patent No. 5,073,484 ('484 patent), are members of a family of patents dealing with technology that is used to detect the presence of a substance of interest within a liquid, such as urine or blood. The presence or absence of the substance of interest can be used to determine the condition of the individual utilizing the test. Home pregnancy tests are the best known practical application of this technology, as well as the basis for this litigation.

1

Specifically, Abbott alleges that home pregnancy tests manufactured by C&D infringe on the patents-in-suit. The claims at issue are claims 1, 7, 9, 10, 16, 11, 22, 28, and 29 of the '162 patent and claims 1, 6, 7, 11, and 12 of the '147 patent. Though each of the asserted claims differs in some respects, claim 9 of the '162 patent is representative of the disclosures made in the various claims:

> A method for detecting the presence of an analyte in a carrier liquid suspected of containing said analyte, which method comprises;
>
> a) providing a liquid permeable solid medium which defines a path for fluid flow capable of supporting capillary flow, along which are i) a site for application of the carrier liquid, ii) a diffusively bound labeled antibody specific for the analyte or a chemical moiety which is itself the reaction product of the analyte with another chemical moiety, said antibody being capable of flow along the flow path, and iii) one or more zones spaced along said flow path, each zone having a predetermined amount of a reactant bound to it which is specific for either the analyte or a chemical moiety which is itself the reaction product of the analyte with another chemical moiety
>
> b) contacting said application site with said carrier liquid such that the liquid passes along the flow path by capillary flow such that analyte or reaction product of the analyte with another chemical moiety becomes bound to both the labeled antibody and the reactant bound to the solid medium; and
>
> c) detecting the labeled antibody which, together with the reactant bound to the solid, medium, has sandwiched the analyte or chemical moiety as an indication of the presence of analyte.

Pl. Ex. A at 16:26-50. In the home pregnancy test embodiment, a urine sample is applied to a test strip to initiate the test. As it runs through the testing mechanism, the substance of interest in the urine, i.e., the hormone or other substance that will indicate the test user is pregnant, binds with antibodies and detector substances. The combination of those substances (or lack thereof) will indicate whether the test user is pregnant or not.

The family of patents at issue in this case has been the subject of extensive prior litigation, though not involving C&D. Some of the prior cases were settled, but others were

litigated to final decisions that have resulted in written decisions. One case involved proceedings before the PTO that were appealed to the Federal Circuit. *See In Re Swanson*, 540 F.3d 1368 (Fed. Cir. 2008). Another case, to which the Court will refer as the *Syntron* litigation, resulted in a number of written decisions in the district court and on appeal. *See, e.g.*, *Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343 (Fed. Cir. 2003) (*Syntron I*); *Abbott Labs. v. Syntron Bioresearch, Inc.*, No. 98 CV 2359, 2000 WL 968110 (S.D. Cal. June 29, 2000) (*Syntron II*); *Abbott Labs. v. Syntron Bioresearch, Inc.*, No. 98 CV 2359, 2000 WL 33967724 (S.D. Cal. Sept. 28, 2000) (*Syntron III*). Where appropriate, the Court has consulted the courts' rulings and Abbott's statements made in other litigation involving the patents-in-suit and the related '484 patent.

## Discussion

Construing the patent claims is the first step in a patent infringement case. *See Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1373 (Fed. Cir. 2004). Claim construction is a question of law for the Court to decide. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The Court begins its analysis by examining the claim language itself. *See Hockerson-Halberstadt, Inc. v. Avia Group Intern., Inc.*, 222 F.3d 951, 955 (Fed. Cir. 2000). A claim term's ordinary and customary meaning, as understood by persons skilled in the relevant technology, is the default meaning. *See id.* The Court may also consider additional intrinsic evidence, which includes the other parts of the patent and the prosecution history of the patent. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-17 (Fed. Cir. 2005) (*en banc*) (citation omitted)

After the claim language, the most important type of intrinsic evidence is the patent's specification. The specification consists of "a written description of the invention, and of the manner and process of making and using it," as well as a description of "the best mode contemplated by the inventor of carrying out his invention," followed by "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. The specification "is always highly relevant to the claim construction analysis . . . it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (citation omitted). The Federal Circuit has repeatedly emphasized that the claims of a patent "must be construed so as to be consistent with the specification." *Merck & Co. v. Teva Pharmaceuticals USA, Inc.,* 347 F.3d 1367, 1371 (Fed. Cir. 2003).

The written description, however, does not limit the scope of the invention as described in the patent claim, because it sometimes describes just one way of practicing the invention – the "preferred embodiment" of the invention. *See Phillips,* 415 F.3d at 1323; *see also* 35 U.S.C. § 112. A patent applicant is not required to include every conceivable embodiment of his invention. *Sunrace Roots Enter. Co. v. SRAM Corp.,* 336 F.3d 1298, 1305 (Fed. Cir. 2003). For this reason, the Federal Circuit has cautioned that it is improper for a court to "import[ ] limitations from the specification into the claims absent a clear disclaimer of claim scope." *Andersen Corp. v. Fiber Composites, LLC,* 474 F.3d 1361, 1373 (Fed. Cir. 2007). The "clear disclaimer" requirement is satisfied only if there is "a clear disclosure that the patentee intended the claims to be limited as shown." *MBO Labs., Inc. v. Becton Dickinson & Co.,* 474 F.3d

1323, 1334 (Fed. Cir. 2007); *Phillips,* 415 F.3d at 1323.  In other words, a court cannot

deviate from the ordinary meaning of a claim term simply by pointing to the written

description or the identification of the "preferred embodiment" contained in the written

description.  *Fuji Photo Film Co. v. Ficosa N. Am. Corp.,* 299 F.2d 1313, 1325 (Fed. Cir.

2002).

Another important source of intrinsic evidence is the prosecution history of the

patent.  Like the specification, "the prosecution history provides evidence of how the

PTO and the inventor understood the patent."  *Phillips,* 415 F.3d at 1317.  Though often

not as clear as the specification, the prosecution history can show "whether the inventor

limited the invention in the course of prosecution, making the claim scope narrower

than it would otherwise be."  *Id.*

The Federal Circuit has authorized judges to rely on extrinsic evidence if the

Court "deems it helpful in determining the true meaning of language used in the patent

claims." *Id.* at 1318 (quotation omitted).  Extrinsic evidence, however, is "less significant

than the intrinsic record" for determining the meaning of the patent claims.  *Id.* at 1317

(quotation omitted).  Extrinsic evidence includes "all evidence external to the patent and

prosecution history, including expert and inventor testimony, dictionaries, and learned

treatises."  *Markman*, 52 F.3d at 980 (citation omitted).  Extrinsic evidence, if used by a

court, must be considered in the context of the intrinsic evidence.  *Phillips*, 415 F.3d at

1319.  The Federal Circuit has cautioned that flaws are inherent in each type of

extrinsic evidence, *e.g.*, dictionary definitions and expert testimony, and courts must

assess that evidence accordingly.  *Id.*

1.      **Analyte**

The term analyte appears in every asserted claim of the patents-in-suit.  Abbott

contends that analyte means "the substance of interest, *i.e.*, the substance that the test

is designed to detect, if present in the liquid being tested"; C&D contends it means the

"chemical moiety which is to be measured quantitatively."  The primary distinction

between these proposed constructions is the quantitative element.  C&D's construction

would limit analytes to substances measured quantitatively, whereas Abbott's

construction would permit qualitative (i.e., the presence of an analyte as opposed to a

specific amount) as well as quantitative testing.

The asserted claims do not contain a limitation that the analyte must be

measured quantitatively.  For example, claim 1 of the '162 patent discloses "[a] device

generating a signal indicative of the presence of an analyte in a liquid solution

suspected of containing said analyte . . . ."  Pl. Ex. A at 15:59-61.  Similarly, claim 9 of

the same patent discloses "[a] method for detecting the presence of an analyte in a

carrier liquid suspected of containing said analyte . . . ."  *Id.* at 16:26-27.  The '147

patent makes similar disclosures in its claims.  *See* Pl. Ex. B at 15:63-64 (disclosing "[a]

device for detecting the presence of an analyte").  None of the disputed claims require

or disclose quantitative measurements of the analyte.

Despite the absence of language about quantitative measurement in the claims,

C&D relies on the patents' specifications for its proposed construction, most importantly

language contained in the summaries of the invention in both patents:  "Accordingly,

'analyte' refers to any chemical moiety which is to be measured quantitatively."  Pl. Ex.

A at 3:19-21; Pl. Ex. B at 3:23-25. C&D also cites a number of examples in both patents that make reference to quantitative measurement. The discussion of quantitative analysis in both patents' specifications, however, is not enough to limit the broad language contained in the claims.

> While claims must be construed in light of the specification, limitations from the specification are not to be read into the claims . . . . The written description may, however, restrict the scope of the claims if the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.

*Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004) (citations and quotation omitted).

The specifications in the patents-in-suit do not clearly disclaim the broad language in the claims concerning detection of the presence of an analyte as opposed to quantitative measurement. Moreover, the language in the summary of invention from which C&D draws its narrow definition is not so limited when read in context of the paragraph preceding it:

> As used herein, "analyte" refers not only to the particular chemical moiety for which analysis is desired, but also to chemical moieties that are reaction products of the moiety to be determined with another chemical moiety. For example, a biological fluid containing an unknown amount of a chemical moiety may be reacted in solution or otherwise with another chemical moiety to provide a product, the concentration of which is related to the initial concentration of the chemical moiety to be measured. The resulting product, then, may become the "analyte" for use in the apparatus and method of the invention. Accordingly, "analyte" refers to any chemical moiety which is to be measured quantitatively.

Pl. Ex. A at 3:9-21; *see also* Pl. Ex. B. at 3:13-25. This description contemplates that quantitative measurement might be made of an analyte and states that any chemical

moiety to be so measured is an analyte for purposes of the patents-in-suit; it does not limit analytes to situations in which a device makes a quantitative measurement.

The Court construes analyte as "the substance of interest, *i.e.*, the substance that the test is designed to detect, if present in the liquid being tested." This result is consistent with the Federal Circuit's ruling in the *Syntron* litigation, where it adopted the construction of analyte that Abbott proposes in this case. *See Syntron I*, 334 F.3d at 1354-55.[1]

## 2.    Chemical moiety

The term chemical moiety appears in claims 9, 22, and 28 of the '162 patent and claims 1 and 7 of the '147 patent. Abbott defines the term chemical moiety as denoting "a substance; a chemical entity." C&D proposes a more particularized definition: "the specific section of a molecule, usually a complex, that has a characteristic effect or property." C&D does not cite any intrinsic evidence in support of its construction, which would limit chemical moiety to a section of a molecule.

The disputed claims make reference to "a chemical moiety which is itself the reaction product of the analyte with another chemical moiety." *E.g.*, Pl. Ex. A at 16:33-35; Pl. Ex. B at 16:2-3. These claims contain no language limiting "chemical moiety" to a section of molecule; rather, they expressly contemplate combinations of different substances to form new chemical moieties. Similar language appears in the patents'

---

[1]Contrary to C&D's contention, the Federal Circuit did not impose a quantitative limitation on the definition of analyte as used in the related '484 patent. In *Swanson*, the court mentioned quantitative measurement in its decision. That decision, however, did not consider the definition of analyte; the language C&D quotes comes from a general introduction about the '484 patent. *See In re Swanson*, 540 F.3d at 1371.

specifications, and, again, nothing there limits chemical moieties to specific sections of molecules.  Accordingly, the Court construes chemical moiety as "a substance" or "a chemical entity."

### 3.    Reaction product

Abbott construes the term reaction product as "the result of the reaction or binding of the analyte or its derivative with a reactant."  C&D defines the same term as "the product of the moiety to be determined with another chemical moiety wherein the concentration of the product is related to the initial concentration of the chemical moiety to be measured."  The term appears in claims 9, 22, and 28 of the '162 patent and claims 1 and 7 of the '147 patent.  In support of its construction, C&D quotes the same paragraph upon which it relied in support of its construction of analyte, which states: "For example, a biological fluid containing an unknown amount of a chemical moiety may be reacted in solution or otherwise with another chemical moiety to provide a product, the concentration of which is related to the initial concentration of the chemical moiety to be measured."  Pl. Ex. A at 3:12-17; Pl. Ex. B at 3:16-21.  As the first two words of that quotation make clear, it represents just one example of how the technology might be applied.  Nothing in the claim language limits the meaning of reaction product to quantitative measurement and the Court will not read such a limitation into the patents-in-suit based on one example in the specification.  *See Phillips*, 415 F.3d at 1323.

C&D's construction appears to be another attempt to append a quantitative limitation to the claims where none exists.  That contention fails for the same reasons it did with respect to the construction of analyte.  The Court construes reaction product as

"the result of the reaction or binding of the analyte or its derivative with a reactant."

**4.      Zone(s)/reactive zone(s)**

The term reactive zones is used in claim 1 of the '162 patent, and the term zone appears in the remainder of the asserted claims.  Both parties contend that the terms are interchangeable, though Abbott, somewhat paradoxically, provides a separate construction for zone that it contends clarifies the construction it proposes for reaction zone.  C&D construes both as "areas on the medium that are distinct from the surrounding areas which bind the analyte or a reaction product of the analyte and a chemical moiety."  Abbott defines reactive zone as "an area on the medium that is distinct from the surrounding areas, i.e., spaced along said flow path, and in which detection of the analyte occurs," and it defines zone as "a reactive zone which is spaced along the flow path with a predetermined amount of reactant bound to it that is specific for the analyte or a reaction product of the analyte."  C&D is correct that the terms zone and reaction zone are used interchangeably.  There is no need to provide a second, clarifying construction for zone that incorporates the meaning of reactive zone.  Accordingly, the Court will adopt one construction for both terms.

Both parties agree that zones are distinct areas on test medium.  C&D argues that within the zones, chemical bonding occurs.  By contrast, Abbott's construction would limit zones to the area in which detection of the analyte occurs.  Claim 1 of the '162 patent discloses "a labeled antibody specific for and bound to said analyte or said reaction product in said reactive zone(s); wherein said device provides a detectable signal in said reactive zone(s) as an indication of the presence of absence of said analyte . . . ."  Pl. Ex. A at 16:5-9.  This language suggests that the zone is where

10

detection of the analyte takes place. The district court in the *Syntron* litigation concluded that language in claim 22 of the '162 patent also supported this conclusion because it indicated the analyte, after binding to the antibody, would bind to the reaction zone where its concentration would allow for detection. *See Syntron II*, 2000 WL 968110, at *13. The court ruled that an area where a chemical reaction takes place was not enough to make it a "reaction zone" as used in the '162 patent. *Id.*

The Court finds persuasive the reasoning of the district court in the *Syntron* litigation. The claims in the patents contemplate that detection of the analyte will occur in the zones, regardless of whether the analyte bonds with the antibody in a different area on the test medium. *See* Pl. Ex. A at 15:65-16:9; Pl. Ex. B at 15:63-16:22. This conclusion is reinforced by additional language in the specification: "[t]he apparatus may further include detector means for detecting in the spaced zones . . . . A procedure embodying the apparatus may take the form in which the analyte or its derivative, as it passes through the reaction zones, becomes bound to the reactant and the presence of the analyte or its derivative within the reaction zones is detected . . . ." Pl. Ex. A at 2:10-44. The Court therefore construes zone(s) and reactive zone(s) as "an area on the medium that is distinct from the surrounding areas, i.e., spaced along said flow path, and in which detection of the analyte occurs."

**5.    Liquid permeable solid medium**

C&D construes the term liquid permeable solid medium to mean "a liquid permeable unitary solid medium." Abbott contends it is not necessary to add the word unitary to the claim term, but in the event the word unitary is a part of the construction,

Abbott seeks to add what it calls a clarification to the effect that "unitary means that the medium provides a continuous flow path and may be made from several pieces of different overlapping or touching materials."  C&D opposes this purported clarification. The parties agree that the word unitary allows for a flow path comprised of overlapping or touching pieces of the same material.  They disagree, however, regarding the type of material.  C&D construes the word unitary to mean the medium can only be made of one material, whereas Abbott contends that it can be made of different materials. Claims 1, 9, and 16 of the '162 patent and claims 1, 6, 7, and 11 of the '147 patent disclose a liquid permeable solid medium.

C&D contends that Abbott is barred from seeking a clarification of the meaning of unitary by the doctrine of issue preclusion.  Issue preclusion does not apply here, however, because there is no indication that the meaning of unitary was actually litigated in the *Syntron* litigation or, if it was, that it was necessary to the determination of that case.  *See, e.g.*, *Washington Group Intern., Inc. v. Bell, Boyd & Lloyd LLC*, 383 F.3d 633, 636 (7th Cir. 2004) (setting forth elements of issue preclusion under federal law).

Perhaps just as importantly, however, neither party has explained why insertion of the word unitary is necessary to construe the claim term liquid permeable solid medium.  The district court in the *Syntron* litigation inserted the word unitary into the claim term, *see Syntron III*, 2000 WL 33967724, at *11, but its basis for doing so is unclear from that decision.  Nor is it apparent that construing the claim term liquid permeable solid medium to include the word unitary was necessary to the resolution of the *Syntron* litigation.  Accordingly, the Court is unpersuaded, at least based upon the

12

present record, that the construction of this term in *Syntron* is issue preclusive in the current lawsuit. *See Washington Group Intern., Inc.*, 383 F.3d at 636.

The Court is likewise unpersuaded that addition of the word unitary to the claim term liquid permeable solid medium is necessary or appropriate as part of claim construction. Claim terms ordinarily are not construed by inserting one word into the middle of a phrase. Accordingly, the Court sees no need to construe the term liquid permeable solid medium. This ruling is without prejudice to either party seeking construction of the term at a later date if it can provide a legal and factual basis to do so.

**6.     Labeled antibody/reactant**

Abbott construes the term labeled antibody/reactant as "any substance that permits detection and includes colloidal gold and other particulate labels." C&D construes the same term as an "antibody firmly attached to a label by a bond stronger than and excluding adsorption." The difference between these definitions has to do with the strength of the bond; Abbott's construction would encompass weaker bonds, such as adsorption. This term appears in claims 1, 7, 9, 22, and 29 of the '162 patent and claims 1 and 7 of the '147 patent.

C&D does not cite any language in the patents-in-suit in support of its construction; rather, it relies on statements made by Abbott as part of reexamination proceedings regarding the related '484 patent before the PTO. C&D claims that Abbott is bound by those statements under the doctrine of prosecution disclaimer.[2] This

---

[2]"[T]he prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same patent

13

doctrine precludes "patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Id.* at 1324. This doctrine only applies "where the alleged disavowal of claim scope is unambiguous." *Id.*[3]

Abbott responds that disclaimer should not apply in this case because its statements did not disclaim adsorption bonds unequivocally. That contention is not supported by the record; in fact, Abbott made a number of clear disclaiming statements before the PTO with respect to the '484 patent. *E.g.*, Def. Ex. I at 5 ("In the field of immuonassay technology, 'labeled' refers more specifically to a firm attachment, such as a covalent bond . . . ."); Def. Ex. J at 26 ("The evidence . . . establishes that those of ordinary skill consider 'labeled' to refer to a covalently bonded moiety."); Def. Ex. J at 28 ("Weiss does not disclose a label, it rather discloses a different technology in which indicators are adsorbed."). These statements, along with a number of similar ones, evidence a clear disclaimer by Abbott with respect to the meaning of labeled reactant/antibody.

---

application." *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004) (considering statements made in prosecution history of related patent for purposes of applying disclaimer).

[3]This should not be confused with the doctrine of prosecution estoppel, which is similar but does not apply at the claim construction stage. *See Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358-59 (Fed. Cir. 2001).

Abbott also contends that prosecution disclaimer is inapplicable because Abbott was unsuccessful in the reexamination proceedings before the PTO. In affirming the patent examiner, the Board of Patent Appeals and Interferences stated "the '484 Specification does not exclude adsorption as a means of labeling nor is there any indication that the term 'labeled' has a meaning contrary to what is accepted in the art which does not exclude 'adsorption.'" Pl. Ex. R at 15 (quotation omitted). C&D contends that Abbott's disclaimers are binding even though it was unsuccessful before the PTO, based on the public notice function of a patent and its prosecution history, which underlies the doctrine of prosecution disclaimer. *See, e.g.*, *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007) ("Prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution.") (internal quotation marks and citation omitted)).

Neither party has cited any authority addressing definitively whether the doctrine of prosecution disclaimer applies in situations where the patentee's position was unsuccessful before the PTO, as is the case here. The closest C&D comes is a decision in which the Federal Circuit stated that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation." *Microsoft Corp.*, 357 F.3d at 1350. Finding disclaimer based on statements ignored by a patent examiner is not, however, the same as finding disclaimer based on a proposed claim construction that the PTO expressly rejected. Indeed, when the PTO expressly rejects an applicant's proposed construction, the idea of public notice cuts in the opposite direction from argued by C&D, as the public

15

presumably is aware that despite an applicant's statements to the contrary, the patent claim in question has a different construction.  In this regard, the Court notes that the Federal Circuit has held that a patent applicant's statements during prosecution do not constitute a clear disclaimer if they are plainly erroneous, because "[a] person of reasonable intelligence would not be misled into relying on [an] erroneous statement, for it is contrary not only to the plain language of the claims and the specification, but also to other statements in the same prosecution document."  *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1348 (Fed. Cir. 2001), *cited in Elbex Video*, 508 F.3d at 1371-72; *see also Rambus Inc. v. Infineon Tech. Ag*, 318 F.3d 1081, 1089-91 (Fed. Cir. 2003) (finding no clear disclaimer because the statement was facially inaccurate in light of the remainder of the prosecution history).

The Court also notes that the doctrine of prosecution disclaimer is arguably analogous to the concept of judicial estoppel, which applies only if the party to be estopped was successful in the prior proceeding.  *See Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*, 445 F.3d 1348, 1353 (Fed. Cir. 2006).  Under these circumstances, the Court declines to rule that the definition of the claim term is circumscribed by Abbott's statements in the reexamination proceedings.

C&D does not proffer any other basis for its construction of labeled antibody/reactant.  The general language in Abbott's proposed construction was the construction adopted by the district court in the *Syntron* litigation.  *See Syntron II*, 2000 WL 866110, at *15.  On the other hand, the Court sees no appropriate purpose to

16

include particularized examples in the construction of the term, as Abbott proposes by its use of the phrase "including colloidal gold and other particulate labels."  The purpose of claim construction is to define a term, not to compare the term to the characteristics of an accused method or device.  *See NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002).  Accordingly, the Court construes labeled antibody/reactant as "an antibody or other substance attached to a label to permit detection."

### 7.     Specific for

Every asserted claim contains the term specific for.  Abbott construes specific for as "particular to and capable of binding with the analyte or a chemical moiety which is itself the reaction product of the analyte with another chemical moiety.  Particular to means capable of preferentially reacting with or binding with the analyte or a chemical moiety which is itself the reaction product of the analyte with another chemical moiety, from among the thousands of molecules potentially in the test sample.  The reactant (*e.g.*, an antibody) can bind to more than one analyte or reaction product."  C&D construes the same term as "particular to and capable of binding with the analyte or chemical moiety of interest.  Particular to means capable of preferentially reacting or binding with the analyte or chemical moiety from among the thousands of molecules potentially in the test sample."  Abbott's proposed construction is the same as C&D's, with two additions.

It is undisputed that C&D's proposed construction was adopted in *Syntron I*.  334 F.3d at 1351-52.  Abbott, though acknowledging that it lost on this issue in *Syntron*,

contends it is only seeking to clarify the Federal Circuit's construction. That additional clarification is unnecessary. Abbott has not cited any support in the record for its putative clarification or provided a justification for its necessity. Most of it is redundant, either within this specific term or by incorporating the construction of other terms. *See Syntron I*, 334 F.3d at 1351-52. Additionally, the language Abbott seeks to add to the construction of specific for appears to be an impermissible effort to construe the patents-in-suit so that they cover the allegedly infringing device or devices. *See NeoMagic Corp.*, 287 F.3d 1062 at 1074. It is well established that courts may not tailor "a claim construction to fit the dimensions of the accused product or process and to reach preconceived judgment of infringement or noninfringement." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1331 (Fed. Cir. 2006). Infringement is an issue for another day.

The Court construes specific for as "particular to and capable of binding with the analyte or chemical moiety of interest. Particular to means capable of preferentially reacting or binding with the analyte or chemical moiety from among the thousands of molecules potentially in the test sample."

**8.    Carrier liquid/a liquid solution suspected of containing said analyte**

Abbott defines the term carrier liquid suspected of containing said analyte as "the test liquid suspected of containing the analyte that is applied to the medium," and liquid solution suspected of containing said analyte as "the solution suspected of containing the analyte that is applied to the medium." C&D defines carrier liquid suspected of containing said analyte as "a liquid of one or more elements, one of which may be the

18

analyte," and liquid solution suspected of containing said analyte as "a solution of one or more elements, one of which may be the analyte."  These terms appear in claims 1, 9, 10, 16, and 22 of the '162 patent and claims 1, 6, 7, 11, and 12 of the '147 patent.

Abbott states in its reply brief that its construction does not exclude the presence of substances other than the analyte in the liquid or solution in question.  Given that understanding, the only difference between the parties' proposed constructions is Abbott's use of the language "that is applied to the medium."  Claims 1 and 22 of the '167 patent and claim 7 and '147 patent contemplate that the device will contain "a site for application" of the carrier liquid or liquid solution.  The patents-in-suit envision application of the carrier liquid or liquid solution to the device, thereby supporting Abbott's proposed construction.  Accordingly, the Court construes carrier liquid suspected of containing said analyte as "the test liquid suspected of containing the analyte that is applied to the medium," and construes liquid solution suspected of containing said analyte as "the solution suspected of containing the analyte that is applied to the medium."  This construction does not exclude the possibility that substances other than the analyte may be present in the relevant liquid or solution.

## 9.    Having traversed said medium

The term having traversed said medium appears only in claim 1 of the '162 patent.  Abbott construes the term as "the test solution itself travels along the medium, from one end to the other, across the reaction zone or zones."  C&D does not believe this term needs to be construed, but to the extent it is proposes "actually having traveled across said medium, including the reactive zones."

The difference between these two definitions is less than clear, but it appears to

involve whether a second liquid can be used to help push the test solution along the medium or whether the test solution moves on its own.  Nothing the language of claim 1 of the '162 patent supports Abbott's contention that the solution must travel along the medium by itself.  Abbott cites statements from the prosecution history that allegedly support its contention; those statements, however, fall well short of being clear enough to impose the "itself" limitation that Abbott seeks.  The Court construes the term having traversed said medium as "actually having traveled across said medium, including the reactive zones."

**10.    Non-diffusively bound**

The term non-diffusively bound appears only in claim 1 of the '162 patent. Abbott construes non-diffusively bound as "a chemical or physical combination of the reactant and the medium, such that the reactant does not dissolve and move within the liquid from a region of high concentration to a region of low concentration. This term does not require that all of the reactant remain in the zone, but only that some reactant does not dissolve and move along the medium."  C&D construes the term as "chemical or physical combination of the reagents and the medium, such that the reagent does not dissolve or move within the liquid from a region of high concentration to a region of low concentration."

This is another term that the Federal Circuit construed in the same manner as C&D proposes but that Abbott seeks to clarify.  *See Syntron I*, 334 F.3d at 1349-51. The construction by the Federal Circuit is well supported by the intrinsic evidence.  The clarification that Abbott seeks is not necessary; rather, it appears to be another attempt to raise an infringement issue as part of claim construction.  This is inappropriate for the

reasons detailed above. Accordingly, the Court construes non-diffusively bound as "chemical or physical combination of the reagents and the medium, such that the reagent does not dissolve or move within the liquid from a region of high concentration to a region of low concentration."

## Conclusion

The disputed claim terms are construed in accordance with the conclusions set forth in this Memorandum Opinion and Order except to the extent that the Court has found it is inappropriate to rule on a construction at this time.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: December 22, 2008